**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. _____ – Civ _____

| | |
|---|---|
| **SUNRISE OF CORAL GABLES** | ) |
| **PROPCO, LLC,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) |
| | ) |
| **CURRENT BUILDERS, INC.,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Sunrise of Coral Gables PropCo, LLC ("Sunrise" or "Owner"), for its Complaint against Defendant Current Builders, Inc. ("Current Builders" or "Contractor"), hereby alleges as follows:

**PRELIMINARY STATEMENT**

1.     This Complaint arises out of Current Builders' abandonment of a construction project and its contract with Sunrise.

2.     Sunrise is the owner of the construction project commonly referred to as Sunrise of Coral Gables located in Coral Gables, Florida (the "Project").

3.     In June 2021, Sunrise entered into a Guaranteed Maximum Price Construction Agreement (the "Agreement") with Current Builders under which Current Builders was to serve as the general contractor for the Project. A true and correct copy of the Agreement is attached hereto as Exhibit A.

1

4.      The Agreement contemplated Sunrise issuing a Limited Notice to Proceed ("LNTP"), allowing Current Builders to proceed with certain work in June 2021, and a full Notice to Proceed ("NTP") with all work no earlier than December 2021.

5.      On June 11, 2021, Sunrise issued a LNTP to Current Builders authorizing Current Builders to proceed with specified dry utility work, and also authorizing Current Builders to pursue subcontractor and vendor awards for the entire Project.

6.      As of December 2021, the City of Coral Gables (the "City") had not yet issued a building permit for the Project. As a result, Sunrise was unable to issue the NTP to Current Builders by December 2021. Current Builders had, however, been released to contract with subcontractors and vendors for the Project, and had repeatedly been reminded to do so.

7.      In January 2022, Current Builders requested an additional $2.5 million from Sunrise to account for purported escalation costs allegedly caused by the City's delay in issuing the Project's building permit. Current Builders made this request notwithstanding the fact that Article 4.3 of the Agreement provides that Sunrise's maximum expenditure for escalation costs between the LNTP and the NTP would not exceed $250,000.

8.      In response to Current Builders' request for $2.5 million for escalation costs, Sunrise requested certain information from Current Builders that was necessary to assess its various positions. Current Builders never provided that information. Instead, on February 2, 2022, Current Builders attempted to unilaterally terminate the Agreement contrary to the express terms of the Agreement and abandoned all work on the Project and under the Agreement. Sunrise responded to Current Builders on February 4, 2022, stating Current Builders did not have the right to terminate the Agreement and reminding Current Builders that the Agreement contained provisions for resolving disputes that Current Builders had not followed. Sunrise directed Current

Builders to continue performing in accordance with the Agreement. Current Builders responded several days later by again expressing its intent to unilaterally terminate the Agreement. In response, Sunrise issued a seven-day notice to Current Builders. After Current Builders failed to respond and failed to return to the Project, Sunrise terminated the Agreement for cause in accordance with the terms of the Agreement.

9.      This Complaint arises from Current Builders' failure to timely and properly cure its material breaches of contract and its abandonment of the Project and its Agreement with Sunrise. By this action, Sunrise seeks to recover damages in excess of $4 million caused by Current Builders' material breaches of contract and its abandonment of the Project and its Agreement with Sunrise, including, *inter alia*, damages associated with hiring a replacement contractor to complete Current Builders' scope of work and the additional time it will take to complete the Project.

### PARTIES, JURISDICTION, AND VENUE

10.      Sunrise is a limited liability company formed under the laws of the State of Delaware with its principal place of business in McLean, Virginia. Sunrise, as a limited liability company, has the citizenship of each of its members, which are citizens of Delaware, Virginia, and Ohio.

11.      Upon information and belief, Current Builders is a corporation organized under the laws of the State of Florida with its principal place of business in Pompano Beach, Florida.

12.      This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Sunrise and Current Builders, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

13.      This Court has personal jurisdiction over Current Builders because it is a citizen of, and has its principal place of business in, the State of Florida.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district and the property that is the subject of this action is situated in this judicial district.

## FACTUAL BACKGROUND

### A.  THE PROJECT AND THE PARTIES

15.     The Project is a six-story assisted living facility, including a basement parking garage.

16.     Sunrise and Current Builders negotiated the Agreement under which Current Builders agreed to serve as the general contractor for the construction of the Project.

### B.  THE GUARANTEED MAXIMUM PRICE CONSTRUCTION AGREEMENT

17.     Sunrise and Current Builders entered into the Agreement as of June 11, 2021.

18.     The Agreement incorporates the General Conditions of the Agreement (the "General Conditions"), supplemental conditions, specifications, drawings, addenda, exhibits, and other specific documents (collectively, the "Contract Documents") by reference. *See* Ex. A, Agreement § 14 (enumerating the Contract Documents).

19.     Current Builders agreed to complete all work required by the Contract Documents for a guaranteed maximum price ("GMP") of $32,570,188.00, as adjusted by approved change orders. Ex. A, Agreement § 4.3.

20.     Current Builders agreed that "[c]osts which would cause the [GMP] to be exceeded shall be paid by the Contractor without reimbursement by the Owner." *Id*.

*Scheduling and Performance of Project Work*

21.     Current Builders agreed to "fully execute the Work described in the Contract Documents" and to "perform the Work in accordance with the Contract Documents." Ex. A, Agreement § 2.1, General Conditions § 3.1.4.

22.     Current Builders represented and warranted to Sunrise that it was "able to furnish plant, tools, materials, supplies, equipment, and labor required to complete the Work in accordance with the Contract Documents and within the time limits set for Substantial Completion and perform [its] obligations [under the Agreement] and has sufficient experience and competence to do so."  Ex. A, Agreement § 13.4.

23.     Current Builders represented and acknowledged:

(i) that the Contract Sum is reasonable compensation for all the Work, (ii) that the Contract Time is adequate for the performance of the Work, (iii) that prior to the date of the Agreement, Contractor has become familiar with the Project site as a result thereof, and (iv) that it has carefully examined the Contract Documents and the Project site, including any existing buildings, and that it has satisfied itself as to the nature, location, character, quality and quantity of the Work required by the Contract Documents … .

Ex. A, General Conditions § 1.5.3.

24.     Current Builders accepted "the relationship of trust and confidence established between [it] and [Sunrise] by the Agreement and the Conditions of the Agreement [and covenanted] to furnish its best skill and judgment, to cooperate with the Architect in furthering the interests of [Sunrise], to furnish efficient business administration and superintendence, to furnish at all times an adequate supply of workmen and materials, and to perform the Work in accordance with the Contract Documents." Ex. A, General Conditions § 3.1.4.

25.     Current Builders was obligated to "furnish sufficient forces, plant and equipment and [to] work such hours, including night shifts and lawful overtime operations as may be

necessary to ensure the prosecution of the work in accordance with the Contract Schedule." Ex. A, General Conditions § 3.10.6.

26.     Regarding commencement of the Work on the Project, the Agreement provided that "[t]he date of commencement … shall be noted in a formal Notice to Proceed [NTP] issued by the Owner" and that the "Contract Time shall be measured from the Commencement Date set forth in the [NTP]." Ex. A, Agreement §§ 3.1, 3.2.

27.     Current Builders was required to "proceed expeditiously with adequate forces and … achieve Substantial Completion within the Contract Time." Ex. A, General Conditions § 8.2.3.

28.     Under the Agreement, Current Builders agreed to pay Sunrise liquidated damages at $9,000 per calendar day beyond the contractual substantial completion date if Current Builders failed to achieve substantial completion of the Project on or before the scheduled date. Ex. A, Agreement § 3.3.

29.     Current Builders agreed and understood that time was of the essence in completing the Work required under the Contract Documents. Ex. A, Agreement §§ 3.3, 8.2.1.

30.     Regarding the Project schedule, Exhibit 3 to the Agreement identified Project milestones and included a construction schedule. Project milestones included issuance of a LNTP, commencement of Florida Power & Light ("FPL") work and vacate easements, final NTP (or notice of commencement), substantial completion, and Project completion. Ex. A, Agreement at Exhibit 3, Construction Delivery Schedule.

31.     Exhibit 3 to the Agreement contemplated the NTP would be issued after the LNTP but no earlier than December 2021. The Agreement contemplated the potential for escalation costs between the issuance of the LNTP and NTP and specifically identified the parties' respective responsibilities for such costs:

> For the period between the limited-notice-to-proceed [LNTP] and the main project notice-to-proceed [NTP], the Owner and Contractor will split, 50% to Owner and 50% to Contractor, cost escalation up to $500,000 with a maximum expenditure for the Owner not to exceed $250,000 which will be processed as a contract change order.

Ex. A, Agreement § 4.3.

32.     Current Builders agreed that progress of Project work by Sunrise "shall not modify or relieve the Contractor of his obligation to maintain his adherence to the Contract Schedule and completion date, unless such work by Owner delays Contractor in its performance of the Work and the Contractor submits a Claim for such delays in accordance with the Contract Documents."

Ex. A, General Conditions § 3.10.8.

### Payment Procedures and Subcontractor Relations

33.     The Agreement set forth the process Current Builders was to follow in submitting monthly payment applications to Sunrise:

> The Contractor will provide with the first Application for Payment and each subsequent Application for Payment, up to the final Application for Payment, a partial release of liens subject to receipt of payment. Upon receipt of payment, the Contractor will secure release of liens from all subcontractors and material/equipment supply companies reflecting the payment made to each subcontractor and material/equipment supply company to Contractor. … Monthly Applications for Payment will include copies of Subcontractor pay applications or invoices to substantiate pay requests. The Contractor shall execute an unconditional final lien release and deliver it to the Owner after all payments for work are made.

Ex. A, Agreement § 11.1.4.

34.     Under the Agreement, Current Builders' payment applications were required to, *inter alia*:

> show the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment. The percentage of completion shall be the lesser of (1) the percentage of that portion of the Work which has actually been completed as verified by the amounts stated in Subcontractor invoices among other things; or (2) the percentage obtained by dividing (a) the expense that has actually been incurred by the Contractor on account of that portion of the Work as

7

verified by the amounts stated in Subcontractor invoices among other things for
which the Contractor has made or intends to make actual payment prior to the next
Application for Payment by (b) the share of the Guaranteed Maximum Price
allocated to that portion of the Work in the schedule of values.

Ex. A, Agreement § 11.1.7.

35.     Upon receipt of a progress payment, the Agreement required Current Builders to

promptly pay, and secure the discharge of any liens asserted by, its subcontractors for work the

subcontractors performed. *See* Ex. A, General Conditions §§ 5.3.1, 9.6.2. Current Builders also

agreed to defend, indemnify, and hold harmless Sunrise against any liability, costs, expenses, or

fees arising from or relating to discharging any lien that a subcontractor asserts against the Project

and clearing the property's title. Ex. A, General Conditions § 5.3.1.

36.     The Agreement provided that Current Builders' payment applications "may not

include requests for payment for portions of the Work for which the Contractor does not intend to

pay to a Subcontractor or material supplier, unless such Work has been performed by others whom

the Contractor intends to pay." Ex. A, General Conditions § 9.3.1.2.

37.     Under the Agreement, Current Builders warranted that it would not submit a

payment application unless all work covered by the previous payment application was free and

clear of liens, claims, security interests, or encumbrances in favor of Current Builders and its

subcontractors. Ex. A, General Conditions § 9.3.3.

38.     The Agreement required Current Builders to cause any lien asserted by one of its

subcontractors to be promptly released or discharged:

> **In the event liens of any kind are recorded or filed by the Contractor's
> subcontractors**, at any tier … **and Owner has made payment to Contractor** for
> such amounts that are properly due, **the Contractor shall promptly cause said
> lien(s) to be released or discharged, by bond or otherwise**. **Within 24 hours** of
> receipt of the notice by Contractor of the recording or filing of the lien, **Contractor
> shall either obtain and record a full release of such lien and claim against the
> Owner or shall furnish a bond reasonably acceptable to the Owner that**

8

> releases such lien (or claim for a lien) against the property and fully
> indemnifies the Owner from any personal liability arising therefrom and that
> fully complies with applicable law. The cost of any premiums incurred in
> connection with such bonds shall be the responsibility of the Contractor and shall
> not be part of or cause any increase in the Contract Sum. The Contractor agrees to
> defend, indemnify and hold the Owner and Owner's Lender harmless against all
> claims, damages, losses and expenses, including attorneys' fees, resulting from any
> breach of the Contractor's obligations under this Subparagraph, including but not
> limited to the costs (including attorneys' fees) of defending against lien
> enforcement actions.

Ex. A, General Conditions § 9.3.5 (emphasis added).

### Claims and Disputes Procedures

39.    Articles 4.3 and 4.4 of the General Conditions included provisions addressing the

processes and procedures Current Builders was required to follow in the event claims or disputes

arose on the Project.

40.    The Agreement allowed for increases in the GMP or extensions of time only in

limited circumstances, and then only if Current Builders complied with the notice and claims

procedures in the Agreement. *See, e.g.*, Ex. A, General Conditions § 4.3.1.

41.    Under the Agreement, claims must have been timely initiated by written notice:

> Time Limits on Claims. Claims by either party must be initiated within 21 days
> after occurrence of the events giving rise to such Claim or within 21 days after the
> claimant first recognizes, or should have recognized upon the exercise of due
> diligence, the condition giving rise to the Claim, whichever is later. Claims must
> be initiated by written notice to the other party. Written notice of claim … is a
> condition precedent to obtaining any relief pursuant to such claim. Failure to
> comply with the written notice provision shall constitute a waiver of such claim.
> Within 21 days following the initiation of a Claim, the Claimant shall provide the
> other party and the Architect: (1) a detailed description of the facts underlying the
> clam; (2) written documentation substantiating the claim; and (3) a detailed
> explanation of the effects of the event giving rise to the Claim on the Contract Sum
> and/or Time. Failure to adhere to the terms of this provision shall constitute a
> waiver of the Claim.

Ex. A, General Conditions § 4.3.2.

42.     Under Section 4.3.6 of the General Conditions, if Current Builders believed "additional cost is involved for reasons including but not limited to … (2) an order by the Owner to stop the Work where the Contractor was not at fault … (6) Owner's suspension or (7) other reasonable grounds," Current Builders was required to file a "Claim" with Sunrise in accordance with the General Conditions.

43.     Regarding delays and time extensions, the Agreement provided a procedure for Current Builders to follow if it wished to make a "Claim" for an increase in the contract time. In such a case, Current Builders was to provide timely written notice. The General Conditions set forth circumstances in which Current Builders would be entitled to an extension of time, assuming Current Builders provided timely written notice:

> If the Contractor wishes to make a Claim for an increase in the Contract Time, written notice as provided in this Article 4 shall be given. The Contractor's Claim shall include an estimate of the probable effect of delay on the progress of the Work. Written notice of Claim is a condition precedent to obtaining any relief pursuant to such Claim. Failure to comply with the written notice provision shall constitute a waiver of such Claim. <u>Time Extension</u>:  Should Contractor be obstructed or delayed in the commencement, prosecution or completion of any portion of the Work on the critical path of the Project schedule, without fault on its part or its subcontractors/suppliers/materialmen at any tier level, by reason of: failure to act, direction, order, neglect, delay or default of the Owner, the Architect/Engineer, or any other contractor employed upon the Project; by changes in the Work; fire, lightning, earthquake, enemy action, act of God or similar catastrophe; by Government restrictions in respect to materials or labor; or by labor disputes beyond Contractor's reasonable control, then Contractor shall be entitled to an extension of time to perform the Work, which shall be equal to the actual time lost on the critical path of the Project schedule by reason of any or all of the causes foresaid. Except for the causes specifically listed above in this clause or as otherwise provided in the Contract Documents, no other cause or causes of delay shall give rise to an extension of time to perform the Work. The granting of an extension is conditioned upon Contractor's timely submission of the aforesaid written notice.

Ex. A, General Conditions § 4.3.7.1.1.

44.     The Agreement contained a "No Damages for Delay" provision that limited Current Builders' remedy for excusable delay to only an extension of time:

NO DAMAGES FOR DELAY: CONTRACTOR EXPRESSLY AGREES NOT TO MAKE, AND HEREBY WAIVES, ANY CLAIM FOR DAMAGES (INCLUDING BUT NOT LIMITED TO THOSE RESULTING FROM **INCREASED LABOR OR MATERIAL COSTS**, DISRUPTION, INEFFICIENCY, LOSS OF PRODUCTIVITY, IMPACTS, INCREASED OVERHEAD, **EXTENDED GENERAL CONDITIONS COSTS**, ETC.) ON ACCOUNT OF ANY DELAY, OBSTRUCTION OR HINDRANCE FOR ANY CAUSE WHATSOEVER, WHETHER OR NOT FORESEEABLE AND WHETHER OR NOT ANTICIPATED, AND AGREES THAT **THE SOLE RIGHT AND REMEDY FOR ANY SUCH DELAYS AND IMPACTS OF ANY KIND SHALL BE AN EXTENSION OF TIME, PROVIDED THE REQUISITE WRITTEN NOTICE OF CLAIM HAS BEEN MET**. THE CONTRACTOR EXPRESSLY ACKNOWLEDGES THAT, SHOULD THE OWNER, IN ITS SOLE DISCRETION, NONETHELESS GRANT ADDITIONAL COSTS VIA A CHANGE ORDER IN CONJUNCTION WITH ADJUSTMENTS TO THE PROJECT SCHEDULE, SUCH SHALL NOT CONSTITUTE A BLANKET WAIVER OF THIS PROVISION, NOR SHALL OTHER PROVISIONS OF THIS CONTRACT IN ANY WAY BE CONSTRUED AS CONFLICTING WITH OR CREATING AN AMBIGUITY IN THE INTERPRETATION OF THIS NO DAMAGES FOR DELAY CLAUSE. Notwithstanding the above, should the Project be delayed as a result of active Owner interference, Contractor shall be entitled to apply for an extension of time and reasonable general conditions costs.

Ex. A, General Conditions § 4.3.7.1.2 (bold emphasis added).

### *Sunrise's Right to Terminate Current Builders*

45.     The Agreement included provisions specifically addressing Current Builders'

failure to perform and Sunrise's right to terminate Current Builders for cause:

> If [Current Builders] … persistently or repeatedly refuses or fails … to supply enough properly skilled workmen or proper materials, or if he fails to make payment to Subcontractors or for materials or labor as required by the terms of any agreement between Contractor and Subcontractor, or … repeatedly fails to meet the Contract Schedule, or … otherwise is guilty of a substantial violation of a provision of the Contract Documents, then [Sunrise] may, without prejudice to any right or remedy and after giving [Current Builders] and his surety, if any, seven (7) days' written notice, terminate the employment of [Current Builders] with respect to the entire Work … .

Ex. A, General Conditions § 14.2.1.

46.     In the event of a termination for cause, the Agreement provided that Sunrise may

"take possession of the site and of all materials, equipment, tools, construction equipment and

machinery thereon owned by the Contractor and may finish the Work by whatever method [Sunrise] may deem expedient." *Id.*

47.     The Agreement further provided that, in such a case:

[T]he Contract Sum for the portion of the Work affected shall be reduced by the cost of finishing such portion of the Work, including compensation for the Architect's services made necessary thereby and any overhead and all other direct costs incurred by the Owner, including, without limitation, all reasonable attorney's fees, additional title costs, insurance, and additional interest because of any delay in completing the Work. If the reduction exceeds the unpaid balance of such Contract Sum, the Contractor shall pay the difference to the Owner.

Ex. A, General Conditions § 14.2.2.

48.     Under the Agreement, Sunrise had the right to suspend work on the Project for its convenience. In particular, the General Conditions provided that Sunrise "may, without cause, order the Contractor in writing to suspend or interrupt the Work in whole or in part for such period of time as the Owner may determine." Ex. A, General Conditions § 14.3.1.

49.     The Agreement also included provisions giving Current Builders a limited right to terminate the Contract. Specifically, the General Conditions provided that Current Builders:

may terminate the Contract if, through no act or fault of the Contractor or a Subcontractor … repeated suspensions, delays or interruptions of the entire Work by the Owner as described in § 14.3 constitute in the aggregate more than 100 percent of the total number of days scheduled for completion, or 120 days in any 365-day period, whichever is less.

Ex. A, General Conditions § 14.1.2.

50.     Under the Agreement, Current Builders did not have the right to terminate the Agreement if there was a bona fide dispute with Sunrise regarding any of the matters set forth in Section 14.1.2 of the General Conditions:

Notwithstanding any provision here, **Contractor shall not stop performance in the event there is a bona fide dispute** with the Owner regarding any of the reasons set forth in § 14.1.1 or 14.1.2. **The performance of the Work shall proceed**

**without delay, but subject to Contractor's right to assert a claim in accordance herewith**.

Ex. A, General Conditions § 14.1.4 (emphasis added).

### C.  THE LIMITED NOTICE TO PROCEED

51.     On June 11, 2021, Sunrise issued Current Builders a LNTP that authorized Current Builders to proceed with dry utility work for Comcast, AT&T, and FPL Utility undergrounding.

52.     The LNTP also authorized Current Builders to proceed with subcontractor and vendor awards for the entire Project. Under the Agreement, Current Builders was to timely pursue subcontractor and vendor awards and was to, "as soon as practicable, and no later than 90 days after award of the Contract," furnish in writing to Sunrise, through the Project Architect, the names of proposed subcontractors and vendors. Ex. A, General Conditions § 5.2.1.

53.     Despite Sunrise's efforts and discussions with Current Builders concerning subcontractor and vendor awards, Current Builders failed to timely pursue subcontractors and vendors following the issuance of the LNTP. For example, as late as December 13, 2021, Current Builders still had not submitted subcontractor authorization packages for all disciplines. Upon information and belief, this failure was the cause of any purported escalation in Project costs.

54.     The NTP was not issued by December 2021 because the City had not yet issued the Project's building permit.

### D.  CURRENT BUILDERS' ABANDONMENT OF THE PROJECT

55.     On January 19, 2022, Current Builders sent a letter to Sunrise regarding cost escalation on the Project. Current Builders requested an allowance change order in the amount of $2.5 million for escalation costs. Current Builders requested a separate change order to cover its general conditions costs from December 13, 2021 until the date an NTP was issued. Finally,

Current Builders took the position that buyout savings would not be considered in calculating the

net escalation at that time but would only be considered later.

56.     On January 21, 2022, Sunrise responded to Current Builders' January 19 letter with

a request for information needed to assess Current Builders' position, including *inter alia*:

      a.   A description of actions taken by Current Builders pursuant to the LNTP issued on June 11, 2021, including the timing of all efforts relating to subcontractor and vendor awards for the entire Project;

      b.   A description as to how Current Builders could have proceeded with on-site work activities if the final NTP had been issued in December 2021 (e.g., how Current Builders could have started the "start/install dewatering wells" activity in December given the fact that Current Builders did not send the dewatering permit application and related documents to Sunrise until January 19, 2022);

      c.   An explanation as to how Current Builders' request for $2.5 million for purported escalation costs is consistent with Section 4.3 of the Agreement that provides Sunrise's maximum expenditure for escalation costs between the LNTP and the final NTP would not exceed $250,000;

      d.   Justification for Current Builders' position that buyout savings would not be considered in calculating the net escalation at that time but would only be considered later;

      e.   A detailed description of the facts, with supporting documentation, to support Current Builders' contention that the $2.5 million in additional costs was actually caused by escalation due to the late issuance of the final NTP as opposed to other causes (e.g., Current Builders' failure to timely pursue subcontractor and vendor awards);

      f.   An explanation as to how Current Builders' request for extended General Conditions costs after December 13, 2021 is consistent with the No Damages for Delay provision in Section 4.3.7.1.2 of the General Conditions; and

      g.   An explanation as to how Current Builders' request for $2.5 million in purported escalation costs is consistent with the waivers and releases in Current Builders' payment applications submitted to Sunrise.

57.     Current Builders did not provide a written response to Sunrise's January 21 letter.

But Current Builders did inform Sunrise that it did not expect Sunrise to pay the entire $2.5 million

in escalation costs and that Current Builders could not even figure out what constituted a material price increase as opposed to a bust in subcontractor bidding.

58.     On or about January 27, 2022, the parties discussed Current Builders' claimed escalation costs. Current Builders informed Sunrise that it estimated buyout savings would be $700,000. Current Builders proposed allocating $300,000 from that savings to fund the construction contingency fund and allocating the $400,000 balance toward escalation costs. Current Builders also proposed allocating $250,000 from its fee toward escalation and that Sunrise issue a change order of $250,000 toward escalation. Current Builders' proposal would have left an outstanding escalation amount of $1.6 million.

59.     On January 28, 2022, Sunrise advised Current Builders that Sunrise could not fully evaluate Current Builders' proposal without the information requested in Sunrise's letter dated January 21, 2022. Sunrise requested a meeting to further discuss the issue of escalation costs. Current Builders never replied to Sunrise's request for a meeting.

60.     Instead, Current Builders sent Sunrise a letter dated February 2, 2022 in which Current Builders stated its intent to unilaterally terminate the Agreement pursuant to Section 14.1.2 of the General Conditions. Current Builders wrongly claimed the "entire Work" had been suspended for more than 120 days.

61.     That same day, Sunrise emailed Current Builders to again request the information originally requested in Sunrise's January 21 letter. Sunrise also requested an action plan from Current Builders. Sunrise emphasized the urgent nature of its requests.

62.     On February 4, 2022, Sunrise responded to Current Builders' February 2 letter. In its response, Sunrise noted that Current Builders had no right to terminate the Agreement. Sunrise also disputed Current Builders' position that the "entire Work" had been suspended, delayed, or

interrupted for 120 days, as required by Section 14.1.2 of the General Conditions. Sunrise further disputed Current Builders' claim that it had completed all work authorized under the LNTP by October 2, 2022. Sunrise noted that Current Builders had performed work on the Project since October 2, 2022, as evidenced by Current Builders' own pay applications that it submitted to Sunrise describing Project work performed after that date. Sunrise stated it was "evident that there are disputes regarding responsibility for payment of escalation costs and [Current Builders'] right to terminate the Agreement pursuant to Section 14.1.2 of the General Conditions." Sunrise reminded Current Builders that the Agreement contained provisions for resolving those disputes that Current Builders had not followed. Sunrise further stated that Current Builders had a contractual duty to continue performance pending resolution of those disputes. Sunrise directed Current Builders to continue performance in accordance with the terms of the Agreement. Sunrise also advised Current Builders that Sunrise would require Current Builders to provide performance and payment bonds as Current Builders was required to do in accordance with Section 11.5.1 of the General Conditions.

63.     On February 7, 2022, Current Builders cancelled the standing weekly Project meeting and also shut off Sunrise's and its Project team's ability to access Procore, the construction management software used by the Project participants.

64.     On February 8, 2022, Current Builders responded to Sunrise's February 4 letter by emailing Sunrise a letter dated February 7, 2022. Current Builders failed to provide the required bonds and, instead, again expressed its intent to unilaterally terminate the Agreement and asked Sunrise to remove Current Builders' name and license information from the building permit application.

65.     As a result of Current Builders' actions and inactions, on February 8, 2022, Sunrise issued a seven-day notice. Sunrise again pointed out that Current Builders did not have the right to terminate the Agreement and noted that Current Builders' actions were not permitted by the Agreement. Because abandonment of the Project was not a right Current Builders had under the Agreement, Sunrise stated that Current Builders' actions, including its wrongful termination of the Agreement and stated intent to abandon the Project, constituted substantial violations of the Contract Documents, as set forth in Section 14.2.1 of the General Conditions. Sunrise's letter provided seven-days written notice for Current Builders to cure its substantial violations. Sunrise stated that, if Current Builders failed to do so, Sunrise would exercise its right to terminate Current Builders for default.

66.     Current Builders failed to cure its substantial violations and failed to return to the Project. Instead, Current Builders sent Sunrise a letter dated February 10, 2022 stating it would "no longer participate in, or be responsible for, any further activities onsite or related to obtaining the Building Permit."

67.     After Current Builders failed and refused to return to the Project by February 15 and otherwise failed to cure its other substantial violations within seven days, Sunrise formally terminated Current Builders pursuant to Section 14.2.1 of the General Conditions by letter dated February 16, 2022. Sunrise advised it would take possession of the Project site and all materials and equipment and would finish the Work. Sunrise directed Current Builders to immediately deliver certain Project documents to Sunrise, including, *inter alia*, plans, drawings, specifications, subcontract files, schedules, and work plans, so that Sunrise could complete the Project in the most cost efficient and expedient manner. Sunrise also directed Current Builders to reopen and transfer

control of Sunrise's documents and records that Current Builders stored in Procore to Sunrise by close of business on February 17, 2022.

68.     Current Builders failed to provide the documents and information that Sunrise directed Current Builders to deliver. Current Builders also failed to reopen and transfer control of the documents and records in Procore. As a result, Current Builders has prevented Sunrise from accessing Sunrise's own Project documents and other proprietary information in which Current Builders has no ownership interest.

69.     Following Sunrise's termination of Current Builders, Sunrise requested bids from potential replacement contractors to construct the Project and complete Current Builders' scope of work. The lowest responsive bid to construct the Project and complete Current Builders' scope of work exceeded Current Builders' GMP by over $4 million.

70.     The foregoing actions and inactions of Current Builders impacted Sunrise, causing it to incur, *inter alia*, additional costs in rebidding and completing the work. Sunrise and its representatives and consultants had to expend significant resources in rebidding the Project.

**E.  CURRENT BUILDERS' FAILURE TO PAY ITS SUBCONTRACTORS**

71.     Prior to abandoning the Project, Current Builders submitted six monthly payment applications to Sunrise to request payment for itself and certain of its subcontractors, including Current Builders' sitework subcontractor, A & A Fonte, Inc. ("A&A").

72.     In its payment application for the period ending November 30, 2021, Current Builders certified that Sunrise had paid Current Builders for all work Current Builders and its subcontractors performed on the Project through October 31, 2021. Current Builders also certified to Sunrise that "all work, labor, material, machinery and equipment furnished by Contractor or Contractor's subcontractors … have been fully paid by Contractor through 10/31/2021 … and that

there are no amounts unpaid in favor of any subcontractor … on the basis of which any lien has been or can be filed for work done … ." In reliance on that certification, Sunrise paid Current Builders $53,058.90 for Current Builders' November 2021 payment application.

73.     Current Builders subsequently submitted a payment application for the period ending December 31, 2021. In that payment application, Current Builders requested payment for work it certified was performed in December 2021, demonstrating that work had, in fact, not been suspended or delayed since October 2021 as Current Builders later claimed. Current Builders certified that Sunrise had paid Current Builders for all work performed on the Project, including work performed by Current Builders' subcontractors, through November 30, 2021. Current Builders also certified to Sunrise that "all work, labor, material, machinery and equipment furnished by Contractor or Contractor's subcontractors … have been fully paid by Contractor through 11/30/2021 … and that there are no amounts unpaid in favor of any subcontractor … on the basis of which any lien has been or can be filed for work done … ."

74.     Current Builders' December 2021 payment application did not request payment from Sunrise for any amounts for work performed by A&A.

75.     On March 8, 2022, A&A recorded a Claim of Lien against the Project with the Clerk of Court for Miami-Dade County (the "March 8 Lien").

76.     The March 8 Lien alleged that A&A furnished services and/or materials on the Project between July 1, 2021 and December 8, 2021 for a total value of $44,475.00. The March 8 Lien alleged that A&A had not been paid $26,632.50 for work it performed on the Project.

77.     On March 9, 2022, A&A recorded a second Claim of Lien against the Project with the Clerk of Court for Miami-Dade County (the "March 9 Lien").

78.     The March 9 Lien alleged that A&A furnished services and/or materials on the Project between July 1, 2021 and December 7, 2021 for a total value of $44,475.00. The March 9 Lien alleged that A&A had not been paid $26,632.50 for work it performed on the Project.

79.     On March 25, 2022, Sunrise sent a letter to Current Builders demanding that Current Builders fulfill its obligation to promptly discharge any and all lien(s) asserted by its Project subcontractors and defend, indemnify, and hold Sunrise harmless against any liability, costs, expenses, or fees arising from or relating to such lien(s). Sunrise reminded Current Builders that the failure to do so would constitute a further material breach of the Agreement.

80.     Although Sunrise's efforts eventually resulted in the discharge of A&A's liens, Sunrise nevertheless incurred costs associated with securing the discharge of and/or bonding off the liens, including attorneys' fees.

81.     All conditions precedent to bringing this action, if any, have been satisfied or have been waived or otherwise excused.

## COUNT I
## BREACH OF CONTRACT

82.     Sunrise incorporates the allegations in Paragraphs 1 through 81 of the Complaint by reference.

83.     The Agreement constitutes a valid and enforceable contract between the parties.

84.     Pursuant to the terms of the Agreement, Current Builders was required to fully execute the work described in the Contract Documents, which consisted of construction of a new six-story assisted living facility with a basement parking garage.

85.     Current Builders failed to fulfill its contractual duties and materially breached the Agreement by *inter alia*: (1) failing to provide adequate manpower; (2) failing to perform the Work; (3) failing to complete the Work; (4) failing to supply performance and payment bonds; (5)

failing to timely submit subcontractor and vendor authorization packages; (6) failing to timely pursue subcontractor and vendor awards; (7) failing to timely and properly cure its substantial violations of the Agreement; (8) attempting to unilaterally terminate the Agreement without cause; (9) attempting to unilaterally terminate the Agreement without following the Agreement's dispute resolution process; (10) cancelling and failing to reinstate weekly Project meetings; (11) shutting off access to Procore; (12) failing to transfer control of the documents and records in Procore; (13) wrongfully converting to its own use Project documents and records in Procore that was the property of Sunrise; (14) abandoning the Project and all work under the Agreement; and (15) failing to timely and fully pay subcontractors for work performed on the Project and/or falsely certifying its payment applications to Sunrise.

86.     Consistent with Section 14.2.1 of the General Conditions, Sunrise provided Current Builders with a seven-day written notice of Current Builders' substantial violations of the Agreement.

87.     After Current Builders failed and refused to cure its substantial violations, Sunrise terminated Current Builders for cause pursuant to Section 14.2.1 of the General Conditions.

88.     As a direct and proximate result of Current Builders' substantial violations of the Agreement, Sunrise has incurred and will continue to incur damages and expenses in excess of $4 million, exclusive of attorneys' fees, interest and costs.

WHEREFORE, Sunrise hereby respectfully requests that this Court enter a judgment in its favor and against Current Builders, Inc. in an amount in excess of $4 million, with the exact amount to be proven at trial, together with attorneys' and experts' fees, interest, costs, and any other and further relief this Court deems just and proper.

<u>**COUNT II**</u>
**DECLARATORY RELIEF**

89.     Sunrise incorporates the allegations in Paragraphs 1 through 81 by reference.

90.     This is a count for declaratory judgment pursuant to 28 U.S.C. § 2201, for the purpose of determining a question of actual controversy between the parties, namely, the question of the validity of a provision of a written contract. There is a bona fide, actual, present practical need for a judicial declaration of the parties' rights under the Agreement.

91.     Current Builders claims it was entitled to unilaterally terminate the Agreement pursuant to Section 14.1.2 of the General Conditions because the "entire Work" had purportedly been suspended for over 120 days due to the lack of a NTP. Sunrise disputed Current Builders' right to terminate the Agreement pursuant to Section 14.1.2 because the "entire Work" had not been suspended, delayed, or interrupted for 120 days, as required by Section 14.1.2 of the General Conditions.  Under Section 14.1.4 of the General Conditions, Current Builders "shall not stop performance in the event there is a bona fide dispute with the Owner regarding any of the reasons set forth in § 14.1.1 or 14.1.2. The performance of the Work shall proceed without delay, but subject to Contractor's right to assert a claim in accordance herewith."

92.     On February 2, 2022, Current Builders attempted to unilaterally terminate the Agreement. In response, Sunrise issued a seven-day notice to Current Builders in accordance with Section 14.2.1 of the General Conditions. After Current Builders failed to respond and failed to return to the Project, Sunrise terminated the Agreement for cause in accordance with the terms of the Agreement.

93.     Based on the foregoing, an actual and justiciable controversy between Sunrise and Current Builders involving the Agreement has arisen and now exists, including (i) whether Current Builders had the right to terminate the Agreement pursuant to Section 14.1.2 of the General

Conditions, and (ii) whether Sunrise properly terminated Current Builders for cause in accordance with the Agreement.

94.     A judicial declaration of Sunrise's rights under the Agreement is necessary in order for Sunrise to proceed as planned with the Project.

WHEREFORE, Sunrise respectfully requests that the Court enter an Order awarding the following relief:

i.      A speedy hearing pursuant to Rule 57 of the Federal Rules of Civil Procedure to declare the parties' rights under the Agreement;

ii.     A judicial declaration that Current Builders was not entitled to terminate the Agreement pursuant to Section 14.1.2 of the General Conditions when there existed a bona fide dispute between Current Builders and Sunrise regarding any of the reasons set forth in Section 14.1.2 of the General Conditions;

iii.    A judicial declaration that Sunrise properly terminated Current Builders for cause in accordance with Section 14.2.1 of the General Conditions; and

iv.     Attorneys' fees, costs, and any other and further relief this Court deems just and proper.

## **JURY DEMAND**

Sunrise hereby demands a trial by jury on all issues.

Dated:  May 11, 2022

Respectfully submitted,

SUNRISE OF CORAL GABLES PROPCO, LLC

By Counsel:

/s/ *Charlie C.H. Lee*
Charlie C.H. Lee (Fla. Bar No. 96671)
  c.lee@mooreandlee.com
Erica Rutner (Fla. Bar No. 70510)
  e.rutner@mooreandlee.com
MOORE & LEE, LLP
110 SE 6th Street, Suite 1980
Fort Lauderdale, Florida 33301
Telephone: (703) 940-3763
Facsimile: (703) 506-2051

Of Counsel:

Thomas L. Wilson (*pro hac vice* application
forthcoming)
  t.wilson@mooreandlee.com
MOORE & LEE, LLP
1751 Pinnacle Dr., Suite 1100
McLean, VA 22102
Tel.: (703) 506-2050
Fax: (703) 506-2051

*Attorneys for Plaintiff Sunrise of Coral Gables
PropCo, LLC*