**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**CASE NO. 1:22-CV-21456-MORENO/GOODMAN**

SUNRISE OF CORAL GABLES PROPCO, LLC,

Plaintiff,

v.

CURRENT BUILDERS, INC.,

Defendant.

_______________________________________/

**REPORT AND RECOMMENDATIONS ON**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT**

In this breach of contract case, Plaintiff Sunrise of Coral Gables Propco, LLC ("Plaintiff" or "Sunrise") and Current Builders Inc.'s ("Defendant" or "Current") filed motions for summary judgment. [ECF Nos. 28-29]. Senior United States District Judge Federico A. Moreno referred to the Undersigned any and all pretrial matters. [ECF No. 40]. Both parties filed their respective responses and optional replies. [ECF Nos. 33-37; 39].

For the reasons discussed below, the Undersigned recommends **denial** of Plaintiff's motion and **partial denial** of (and **partial granting** of) Defendant's motion. By way of summary, there are myriad factual disputes, and the parties repeatedly disagree

about the inferences that should arise from the facts upon which they agree. Summary judgment is therefore largely unavailable.

## I. PROCEDURAL HISTORY

Plaintiff owns a property which is now a six-story assisted living facility. [ECF No. 20]. As the owner of the property, Plaintiff entered into a $32,570,188.00 Guaranteed Maximum Price Construction Agreement (to build the facility).[1] The Agreement set forth the parties' respective rights and obligations, including claim and dispute procedures. In it, Defendant agreed that in the event of a dispute between the parties, it would continue working on the project subject to its right to submit a claim.

The Agreement contemplated a Limited Notice to Proceed in June 2021 and a full Notice to Proceed in December 2021. Following the Limited Notice, Plaintiff alleges, Defendant failed to timely pursue subcontractor and vendor awards. In December 2021, Plaintiff did not issue the Notice to Proceed because of the delay in receiving the necessary building permit from the City of Coral Gables.

The following month, Defendant sent Plaintiff a letter regarding escalating costs on the project, asking for an additional $2.5 million in a Change Order. After some initial discussions about its request and after Plaintiff responded to the request with a letter requesting additional information about the proposed increase, Defendant

[1] The contract price could be adjusted by approved change orders.

terminated the Agreement (without responding to the letter asking for an explanation about the Change Order request).

Plaintiff claims that Defendant unlawfully terminated the Agreement on February 2, 2022, alleging that Defendant "abruptly changed its approach and terminated the Agreement and abandoned the project on February 2, 2022, arguing for the very first time that the entire Work had been suspended since October 2, 2021." [ECF No. 28-2, p. 7].

On February 8, 2022, Plaintiff issued a seven-day notice to cure, as set forth in the Agreement. Defendant failed to cure and did not return to work on the project. Approximately a week later, Plaintiff terminated Defendant for cause. In July 2022, Plaintiff entered into a subsequent agreement with a replacement contractor, Winmar.

Both parties filed motions for summary judgment. Plaintiff's motion requests that the Court find: (i) that Defendant improperly terminated and breached the parties' Agreement, (ii) that Plaintiff properly terminated the Agreement due to Defendant's default, and (iii) that Defendant's first and second Affirmative Defenses should be dismissed. *Id.* 20.[2] Defendant's motion requests that the Court should enter summary judgment on all counts against Plaintiff because Plaintiff's claims are barred due to its alleged breach and because some claims are legally unavailable. [ECF No. 29, p. 2].

---

[2] The Court relies on the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

## II. FACTUAL BACKGROUND

Plaintiff and Defendant each submitted an initial statement of material facts (and a response to their opponent's statement of facts).

Introductory Remarks About the "Facts"

The facts are generated from the paragraphs in the statement of facts (and statement of additional facts) or responses to the statements of facts which the opposing party expressly agreed are undisputed. For those purported facts which the opposing party classified as *partly* disputed, the Undersigned includes only the *undisputed* portions. At times, an undisputed fact is supplemented with a portion of the response in order to place the fact in context and provide a fuller understanding of the specific fact.

The Undersigned sometimes changed the wording of an undisputed fact for stylistic and/or grammatical purposes. In addition, to enhance readability, I removed the specific record citations. They can be found in the source document, if needed.

If a party argued that a purported fact was disputed but did not provide record evidence to support the contention, then I deemed the fact to be *undisputed* if otherwise supported by record evidence.

I also ignored disputes that were not actual **disputes**. Adding an *additional,* but *not contrary*, fact, does not generate a bona fide factual dispute. Instead, the new fact is merely an additional fact which the opposing party is permitted to include in its own statement of additional facts if it believes it to be material.

This type of **non**-dispute is illustrated by the following hypothetical: A defendant submits a statement of facts which contends through record evidence citations that a traffic light was green for defendant at the time of the vehicle collision at issue, and the plaintiff's response claims that this fact is **disputed** because it was raining at the time of the collision. The fact of rain does not create a factual dispute about the traffic light's status. Instead, it is simply an additional fact which a plaintiff can place in his own statement of additional facts.

This analogy applies even if the party opposing the summary judgment motion offered several additional facts to support the notion that the undisputed fact is actually disputed. Thus, if the hypothetical affidavit mentioned above also explained that it was storming, the visibility was poor, the radio was on loud, it was dusk, the driver was changing stations on the car radio, the windshield wipers were inoperable and the plaintiff was speeding, none of these additional facts would cause the undisputed fact that the light was green for the defendant driver to somehow be deemed a disputed fact.

By including a fact as undisputed, the Undersigned is not *necessarily* finding that the fact is legally relevant and admissible. Rather, the listing of a fact simply means that it is undisputed. The Undersigned may, in the analysis section, choose to label a fact as irrelevant or to ignore it because it is immaterial. However, the Undersigned sometimes decided to omit a purported fact if it is clearly immaterial and inadmissible, or if it

lacked a necessary factual foundation or predicate. When the Undersigned reached these conclusions, the reference “N/A” would also be used if there were no other facts which could fairly be classified as undisputed.

Framed by these rules, the following facts are undisputed unless otherwise noted. The numbered paragraphs correspond to the numbered paragraphs in each party's Statement of Undisputed Material Facts. [ECF Nos. 28-1; 29-1]. If a purported fact was appropriately disputed, then the term “N/A” is listed next to the paragraph number. Many of Defendant's disputes concern the meaning of the term "Work" in the Agreement. I previously rejected Defendant's understanding of "Work" in my Order on Plaintiff's Motion *in Limine*. [ECF No. 58]. Therefore, Defendant's so-called factual disputes related to that term will not be included.

After listing the Undisputed Facts from the Plaintiff's Statement of Undisputed Facts [ECF No. 28-1], I then list Plaintiff's additional facts filed in response to Defendant's Statement of Material Facts. [ECF No. 33]. The Undersigned concludes by listing Defendant's Statement of Undisputed Material Facts [ECF No. 29-1] and its additional facts filed in response [ECF No. 35-1] to Plaintiff's Statement of Undisputed Facts.

## Plaintiff's Undisputed Facts

*The Parties and the Contract*

1. Sunrise is the Owner of a Project that will generally consist of a six-story assisted living facility, including a basement parking garage.

2. On June 11, 2021, Sunrise and Current entered a Guaranteed Maximum Price ("GMP") Contract (the "Agreement") wherein Current agreed to serve as the general contractor for the construction of the Project.

3. The Agreement identified the GMP as $32,570,188.00, as may be adjusted by approved change orders. Section 4.3 of the Agreement stated that "[c]osts which would cause the Guaranteed Maximum Price to be exceeded shall be paid by the Contractor without reimbursement by the Owner."

4. At Section 1.1.3, the General Conditions to the Agreement ("General Conditions") stated that the term "Work" means "the construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. The Work may constitute the whole or a part of the Project."

5. At Section 3.1, the Agreement stated that the "[t]he date of commencement of the Work shall be noted in a formal Notice to Proceed issued by the Owner." Similarly,

Section 8.1.2 of the General Conditions stated that "[t]he date of commencement of the Work is the date established in the Owner's Notice to Proceed."

6. At Section 3.2, the Agreement stated that "[t]he Contract Time shall be measured from the Commencement Date set forth in the Notice to Proceed."

7. The Work included the preparation of drawings, diagrams, and other data, also known as "Shop Drawings," illustrating portions of the Project. General Conditions. Section 3.12.1.1 required Current, "[w]ithin 2 weeks after being awarded the Contract, . . . to submit for the Owner and Architect's approval a Schedule for the submission of all shop drawings, product data and samples required on the Project."

8. At Section 4.3, the Agreement set forth various terms concerning the GMP. Relevant here, Section 4.3 stated that "[f]or the period between the limited-notice-to-proceed [("LNTP")] and the main project notice-to-proceed [("NTP")], the Owner and Contractor will split, 50% to Owner and 50% to Contractor, cost escalation up to $500,000 with a maximum expenditure for the Owner not to exceed $250,000 which will be processed as a contract change order."

9. Current understood that Section 4.3 made it responsible for some portion of escalation costs following issuance of the LNTP.

10. At Section 11.5.1, the General Conditions stated that Sunrise may require Current to furnish bonds.

11. At Section 14.1.2, the General Conditions stated that:

> The Contractor may terminate the Contract if, through no act or fault of the Contractor or a Subcontractor, Sub-subcontractor or their agents or employees or any other persons or entities performing portions of the Work under direct or indirect contract with the Contractor, repeated suspensions, delays or interruptions of the entire Work **by the Owner as described in § 14.3** constitute in the aggregate more than 100 percent of the total number of days scheduled for completion, or 120 days in any 365- day period, whichever is less.
>
> (emphasis supplied)

12. At Section 14.3, the General Conditions stated that "[t]he Owner may, without cause, order the Contractor in writing to suspend or interrupt the Work in whole or in part for such period of time as the Owner may determine."

13. At Section 14.1.4, the General Conditions stated that:

> ***Notwithstanding any provision here*, Contractor shall not stop performance in the event there is a bona fide dispute with the Owner regarding any of the reasons set forth in** § 14.1.1 or ***14.1.2***. The performance of the Work shall proceed without delay, but subject to Contractor's right to assert a claim in accordance herewith.
>
> (emphasis supplied).

14. Exhibit 3 to the Agreement is the Construction Delivery Schedule. Among other schedule items, the first page of Exhibit 3 identified the "Limited Notice to Proceed – Day" as occurring 185 days prior to the "Notice of Commencement." Similarly, page 2 of Exhibit 3 identified the "Limited Commencement" as having an early start date of June 21, 2021, with the "Final Commencement" as having an early start date of December 21, 2021.

15. N/A

16. At Section 4.3.2, titled "Time Limits on Claims," the General Conditions stated that:

> Claims by either party must be initiated within 21 days after occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes, or should have recognized upon the exercise of due diligence, the condition giving rise to the Claim, whichever is later. Claims must be initiated by written notice to the other party. Written notice of claim, in accordance with Paragraph 4.3, is a condition precedent to obtaining any relief pursuant to such claim. Failure to comply with the written notice provision shall constitute a waiver of such claim. Within 21 days following initiation of a Claim, the Claimant shall provide the other party and the Architect: (1) a detailed description of the facts underlying the claim; (2) written documentation substantiating the claim; and (3) a detailed explanation of the effects of the event giving rise to the Claim on the Contract Sum and/or Time. Failure to adhere to the terms of this provision shall constitute a waiver of the Claim.

17. At Section 4.4.1, titled "Claim Meeting," the General Conditions stated that:

> In the event either party makes a Claim, the parties shall meet within 30 days after the making of the Claim for the purpose of resolving the Claim. Either party may request that the Architect attend this meeting. Such meeting shall be a condition precedent to proceeding with litigation of the claim.

18. Section 14.2 of the General Conditions was titled "Termination by the Owner for Cause." Section 14.2.1 then stated in relevant part that:

> If the Contractor . . . persistently or repeatedly refuses or fails, except in cases of which extension of time is provided, to supply enough properly skilled workmen or proper materials,…or if he repeatedly fails to meet the Contract Schedule, or if he otherwise is guilty of a substantial violation of a provision of the Contract Documents, then the Owner may, without prejudice to any right or remedy and after giving the Contractor and his surety, if any, seven (7) days' written notice, terminate the employment of the Contractor with respect to the entire Work….

*The Limited Notice to Proceed and Current's Partial Performance*

19. Sunrise issued a LNTP on June 11, 2021.

20. The LNTP authorized Current to proceed with specified dry utility work and "Subcontractor & Vendor Awards with associated Shop Drawings & Submittals for the entire project." The LNTP further stated that "[n]o additional physical work (other than what you have performed to date) is to occur on site until you are provided written authorization to proceed with the remainder of the job."

21. Current commenced its work under the LNTP from June 11, 2021 and there were no Sunrise-caused delays to the LNTP work.

22. Current performed work under the Agreement after October 2, 2021. For example, Current continued with subcontractor and vendor awards through February 2, 2022, and had not awarded all of its subcontracts as of February 2, 2022. Current requested authorization from Sunrise to enter into agreements with subcontractors in December 2021 and January 2022. Current's subcontractor and vendor awards were never suspended, and these activities were ongoing as of February 2, 2022.

23. Current performed scope review meetings with potential subcontractors after October 2, 2021, including an onsite scope review meeting on November 18, 2021 with a potential cladding subcontractor.

24. Current continued submitting Shop Drawings and making other submittals through February 2, 2022, and had not completed the Shop Drawings and submittals as of that date. Current also had not completed a Shop Drawing schedule as of February 2, 2022. The completion and submission of Shop Drawings and submittals were never suspended and were ongoing as of February 2, 2022.

25. Current billed Sunrise under the Agreement for certain Shop Drawing and submittal assignments, including billings for tasks performed in December 2021 and January 2022.

26. Current continued to submit Requests for Information ("RFIs") to the Project architect after October 2, 2021, including RFIs in December 2021 and January 2022.

27. After October 2, 2021, Current pursued and obtained final inspections pursuant to the LNTP, including an inspection occurring on November 1, 2021.

28. [Defendant disputes whether the meeting minutes refer to *potential* work (not that the work could *actually be* performed, or that it *could be* performed without another notice to proceed being issued). Defendant does not address (and therefore does not dispute) the remaining portions of paragraph 28, reproduced here.]. By no later than July 27, 2021, Current also began considering other work not addressed in the LNTP, but that could be performed prior to the Notice to Proceed. Specifically, Current noted in its July 27, 2021 Owner-Architect-Contractor ("OAC") Meeting Minutes that "CB to

propose additional work that can be completed without the Master Builder Permit/Foundation Permit."

29. Current entered into an agreement with All Webbs Enterprises, Inc. ("All Webbs") for the Project, including the well work referenced in the July 27, 2021 OAC Meeting Minutes. All Webbs then sub-subcontracted tasks on the Project to NV5, Inc. ("NV5").

30. Between November 17 and 19, 2021, Current caused All Webbs, through NV5, to perform borings, or "test holes," at the Project site.

31. In November 2021, All Webbs provided a Reasonable Assurance Report ("RAR") for the Project in order to obtain a permit for the temporary well. The RAR did not meet Department of Environmental Protection ("DEP") requirements.

32. Accordingly, at Current's direction, All Webbs, through NV5, returned to the Project site on December 28 and 29, 2021, and performed additional test drilling.

33. Current recorded the drilling in its OAC Meeting Minutes and internal correspondence.

34. On January 18, 2022, Current provided Sunrise with a "Stormwater Drainage Well Reasonable Assurance Investigation" report confirming, among other things, the drilling of test holes at the site "[f]rom November 17 to November 19, 2021 and from December 28 to December 29, 2021…."

*Current's Improper Termination and Abandonment of the Project*

35. The NTP was not issued in December 2021 due to permitting delays with the City.

36. On January 19, 2022, Current submitted correspondence to Sunrise alleging that economic and industry conditions "over the past year [and] especially in the last quarter of 2021" had "significantly impacted" Current's ability to obtain competitive vendor and supplier pricing, resulting in "dramatic escalation costs." Current, therefore, requested that Sunrise provide Current with certain forms of contractual relief, including an "Allowance Change Order for the escalation cost in the amount of $2,500,000."

37. On January 21, 2022, Sunrise responded to Current's January 19 letter and requested that Current provide specific information necessary to assess Current's position, including a description of Current's subcontracting efforts and an explanation why subcontractor authorization packages were not submitted to Sunrise until after the contemplated December 2021 NTP date. Sunrise also requested "[a]n explanation as to how [Current]'s request for $2.5 million for escalation is consistent with Section 4.3 of the Construction Agreement that provides that the Owner's maximum expenditure for escalation costs between the Limited NTP and the final NTP would not exceed $250,000." Sunrise advised that a meeting would be scheduled after the requested information was provided by Current.

38. Instead of providing the information requested in Sunrise's January 21 letter, Current terminated the Agreement less than two weeks later.

39. Specifically, on February 2, 2022, Current issued to Sunrise a "Notice of Termination Pursuant to Section 14.1.2 of General Conditions," informing Sunrise that Current was terminating the Agreement. According to Current, from the June 11, 2021 LNTP "through completion of the work specified therein on October 2, 2021, Current [ ] performed Construction at the site until it was required to suspend all further work per the Owner's directive on the same Limited Notice to Proceed . . ." Current alleged that "the work has been suspended per the directive of the Owner for more than 120 days in any 365-day period."

40. At no time prior to Current's February 2nd correspondence had Current submitted a delay claim relative to the Project, nor had Current notified Sunrise that Current believed its work had been suspended.

41. Sunrise responded to Current's February 2nd Notice on February 4, 2022. In that correspondence, Sunrise advised that it "disputes that [Current] has any right to terminate the Contract," including because "the Work does not start until the Owner issues the Notice to Proceed" and because Current "has performed work on the project since October 2, 2021 . . . " Sunrise, therefore, stated that "[i]t is evident that there are disputes regarding responsibility for payment of escalation costs and [Current's] right to terminate the Contract pursuant to Section 14.1.2 of the General Conditions."

Sunrise then quoted Section 14.1.4 and directed Current "to continue performance in accordance with the terms of the Contract." Sunrise also requested that Current provide performance and payment bonds, as permitted by the Agreement.

42. Based on the foregoing, Current understood that Sunrise disagreed with Current's position and disputed that Current had the right to terminate the Agreement.

43. Nevertheless, Current refused to continue performance and responded to Sunrise on February 7, 2022, re-stating that Current had terminated the Agreement effective February 2, 2022.

44. Current never submitted a claim to Sunrise relative to the parties' dispute regarding whether Current possessed the right to terminate the Agreement.

45. Current took numerous other actions as a result of its termination of the Agreement, including refusing to provide performance and payment bonds as requested by Sunrise, terminating the scheduled weekly Project meeting, and terminating Sunrise's access to the Project document management platform (Procore).

46. Current refused to comply with Sunrise's requests and took the above-referenced actions based on its February 2nd termination of the Agreement. Current took the position that it had "no further obligations under the [Agreement]" after that date.

47. Sunrise responded to Current's February 7th letter on February 8th, 2022. Sunrise referenced Current's wrongful termination of the Agreement and stated that, "[b]ecause [Current] has stated in no uncertain terms that it is terminating the Contract and abandoning the Project, Sunrise is not required to provide a cure notice. Nevertheless, please consider this letter as Sunrise's seven[-]day written notice of [Current]'s obligation to fully cure these substantial violations." Sunrise requested that Current take various actions, including providing a written confirmation that Current will continue to perform all the work under the Agreement.

48. Current did not take any of the actions requested by Sunrise's February 8th letter. Further, on February 10th, Current stated to Sunrise that Current "is no longer the Contractor associated with the above-referenced Project and will no longer participate in, or be responsible for, any further activities onsite or related to obtaining the Building Permit."

49. Accordingly, on February 16, 2022, Sunrise issued a "Notice of Termination for Cause" wherein Sunrise terminated the Agreement for cause pursuant to General Conditions Section 14.2.1.

<u>Defendant's Additional Facts</u>

50. Section 2.1 of the Contract, entitled "THE WORK OF THIS CONTRACT," defines the "Work" under the Contract as "[t]he Work of the Contract generally consists of the construction of a new 6-story assisted living facility with a basement parking garage."

51. Section 14 of the Contract enumerates the priority of the Contract Documents and indicates, in pertinent part, that the Agreement, including Section 2.1, takes priority over the General Conditions (which includes the definition of "Work" cited at § 1.1.3 definition).

Defendant's Undisputed Facts

1. Current, as general contractor, entered into a contract with Sunrise, as developer/owner, dated June 11, 2021 (the "Agreement").

2. Michael Taylor, the CEO of Current, negotiated the Agreement on behalf of Current and signed the contract on Current' behalf.

[Plaintiff argues that Defendant had multiple representatives present during the negotiation. [ECF No. 33].].

3. A copy of the Agreement, with the exception of certain construction related documents, drawings, specifications and Addenda incorporated by Section 1.1.1 of the Agreement, is attached as Exhibit A to the Amended Complaint.

4. The Agreement was a GMP contract.

5. N/A.

6. Pursuant to Section 3.1 of the Agreement, Sunrise was to issue an NTP to Current authorizing Current to proceed with building the Project.

[Plaintiff argues that § 3.1 additionally includes "Work," as defined in § 1.1.3 of the General Conditions. There, it's defined as "the construction and services required

by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. The Work may constitute the whole or a part of the Project." [ECF No. 33].].

7. Exhibit 3 to the Agreement contained the project schedule, and it provided in relevant part that the LNTP would be issued not [sic] later than June 21st, and that the NTP would be issued no later than 185 days after the LNTP was issued.

[Plaintiff argues that Exhibit 3 does not address the NTP or state that the LNTP or NTP would be issued "no later than" the specified date.].

8. Section 3.3 of the Agreement provides, in relevant part, that “time is of the essence in completing the Work required under the Contract Documents.” And Section 8.2.1 of the General Conditions states: “Time limits stated in the Contract Documents are of the essence of the [Agreement].”

9. Sunrise issued the LNTP to Current on June 11, 2021.

10. The LNTP provided in relevant part:

> You are hereby authorized to proceed with the following scope in accordance with the applicable plans and specifications for this project:
> - Dry Utility for Comcast, AT&T, and FPL Utility Undergrounding
> - Subcontractor & Vendor Awards with associated Shop Drawings & Submittals for the entire project
>
> No additional physical work (other than what you have performed to date) is to occur on site until you are provided written authorization to proceed with the remainder of the job.

11. N/A.

12. Pursuant to Exhibit 2 to the Agreement, Sunrise was required to obtain the Building Permit.

13. In order to issue the NTP, Sunrise had to obtain the Building Permit, so that the work could be authorized and proceed.

14. Sunrise did not obtain the Building Permit in December 2021 and did not issue the NTP in December 2021, January 2022, or February 2022.

15. Sunrise never issued the NTP to Current and did not obtain the Building Permit until November 17, 2022. [In the Order on Plaintiff's Motion *in Limine*, the Undersigned determined that the actual issuance date of the Building Permit is not relevant, given that it occurred *after* Defendant terminated the Agreement.].

16. N/A.

17. N/A.

18. N/A.

19. N/A.

20. Sunrise sent a letter dated February 4, 2022, contesting Current's right to terminate.

21. The General Conditions provide procedures parties to the Agreement must follow in making a "Claim" and before filing litigation.

[Plaintiff notes that the General Conditions do not address situations where a required claimant fails and refuses to continue performance and to submit a claim.].

22. Section 4.3.1 of the General Conditions defines "Claim" as follows:

> A Claim is a demand or assertion by one of the parties seeking, as a matter of right, adjustment or interpretation of the Contract terms, payment of money, extension of time or other relief with respect to the terms of the Contract. The term "Claim" also includes other disputes and matters in question between the Owner and Contractor arising out of relating to the Contract. Claims must be initiated by written notice. The responsibility to substantiate Claims shall rest with the party making the Claim.

23. Sunrise never initiated a "Claim" under the Agreement contesting Current's right to terminate the Agreement.

24. On February 16, 2022, Sunrise issued a written letter purporting to terminate Current.

25. Section 4.3.2 of the General Conditions, provides that:

> Claims by either party must be initiated within 21 days after occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes, or should have recognized upon the exercise of due diligence, the condition giving rise to the Claim, whichever is later. Claims must be initiated by written notice to the other party. Written notice of claim in accordance with Paragraph 4.3, is a condition precedent to obtaining any relief pursuant to such claim. Failure to comply with the written notice provision shall constitute a waiver of such claim. Within 21 days following initiation of a Claim, the Claimant shall provide the other party and the Architect: (1) a detailed description of the facts underlying the claim; (2) written documentation substantiating the claim; and (3) a detailed explanation of the effects of the event giving rise to the Claim on the Contract Sum and/or Time. Failure to adhere to the terms of this provision shall constitute a waiver of the Claim.

26. Section 4.4.1, provides that:

> In the event either party makes a Claim, the parties shall meet within 30 days after the making of the Claim for the purpose of resolving the Claim.

> Either party may request that the Architect attend this meeting. Such meeting shall be a condition precedent to proceeding with litigation of the claim.

27. On May 11, 2022, Sunrise filed suit against Current.

28. Prior to filing its suit, Sunrise never complied with the Agreement's General Conditions in Sections 4.3 or initiate or conduct the meeting required by Section 4.4.1.

29. The Agreement contains an express waiver of consequential damages at Section 4.3.10 of the General Conditions.

<u>Plaintiff's Additional Material Facts</u>

30. The Agreement contains multiple terms concerning potential Project delays. For example, Section 4.3.7 of the General Conditions is titled "Claims for Additional Time." Section 4.3.7.1.1 states, in relevant part, "[s]hould Contractor be obstructed or delayed in the commencement, prosecution or completion of any portion of the Work on the critical path of the Project schedule, . . . by reason of . . . failure to act, direction, order, neglect, delay or default of the Owner . . . then Contractor shall be entitled to an extension of time to perform the Work…." Section 4.3.7.1.1 also states that, "[i]f the Contractor wishes to make a Claim for an increase in the Contract Time, written notice as provided in this Article 4 shall be given."

31. Section 4.3.7.1.2 of the General Conditions then contains a "NO DAMAGES FOR DELAY" term wherein Current agreed to waive any claim for damages due to delay, obstruction, or hinderance and agreed that its sole remedy shall be an extension

of time; provided, however, "should the Project be delayed as a result of active Owner interference, Contractor shall be entitled to apply for an extension of time and reasonable general conditions costs."

32. Section 14.1.1 of the General Conditions stated that Current may terminate the Agreement upon seven (7) days written notice "if the Work has been stopped for a period of ninety (90) consecutive days" due to certain specified events, including owner non-payment, "issuance of an order of a court or other public authority," or "an act of government."

33. [Defendant disputes whether the meeting minutes refer to potential work (not that the work could actually be performed) or that it could be performed without another notice to proceed being issued. Defendant does not address (and therefore does not dispute) the remaining portions of paragraph 33, reproduced here.]. By no later than July 27, 2021, Current began considering other work not addressed in the LNTP, but that could be performed prior to the NTP. Current noted in its July 27, 2021 OAC Meeting Minutes that "CB to propose additional work that can be completed without the Master Builder Permit/Foundation Permit. Deep Well -- Temporary Dewatering -- Test Pile."

34. Current entered into an agreement with All Webbs to perform work on the Project, including the well work referenced in the July 27, 2021 OAC Meeting Minutes. All Webbs then sub-subcontracted work on the Project to NV5.

35. Between November 17 and 19, 2021, Current caused All Webbs, through NV5, to perform borings, or "test holes," at the Project site. In November 2021, All Webbs provided an RAR for the Project in order to obtain a permit for the temporary well. The RAR did not meet DEP requirements.

36. At Current's direction, All Webbs, through NV5, returned to the Project site on December 28 and 29, 2021, and performed additional test drilling. Current recorded this drilling work in its OAC Meeting Minutes and internal correspondence.

37. On January 18, 2022, Current provided Sunrise with a "Stormwater Drainage Well Reasonable Assurance Investigation" report, confirming, among other things, the drilling of test holes at the site "[f]rom November 17 to November 19, 2021 and from December 28 to December 29, 2021…."

38. The Project building permit was not obtained by December 2021 due to requests and comments received from the City of Coral Gables.

39. Current never submitted a delay claim to Sunrise, nor did Current ever inform Sunrise prior to February 2, 2022 that Current believed its work had been delayed or suspended. Current has also confirmed, under oath (in an interrogatory answer), that Sunrise did **not** breach the Agreement.

[Defendant notes that after its Answer and affirmative defenses were filed, it asserted, and continued to assert in testimony, that Plaintiff breached the Agreement. [ECF 39-1, p. 3].].

40. Current's monthly payment applications waived all claims through the end of the month for which payment was sought. For example, Current's December 2021 invoice included an executed "Contractor's Certificate and Conditional Waiver and Release Upon Progress Payment" certifying, in part, that, "in consideration of the receipt of $10,070.35 . . . **Contractor does hereby waive, release and relinquish any and all claims, demands, rights of lien and stop notice rights of Contractor** under the contract through **12/31/2021** . . . except for unpaid retention and unresolved change order proposals listed below." (emphasis added). Current's December 2021 payment application did not reserve any claims for delay or suspension, and Sunrise paid Current the December 2021 invoiced amount of $10,070.35.

41. In early January 2022, Current believed that construction would not commence until mid-February, at the earliest. On January 19, 2022, Current submitted correspondence to Sunrise stating that "[t]he agreement . . . contemplated final NTP on December 13th, 2021" and alleging "dramatic escalation costs." Current requested that Sunrise provide Current certain forms of contractual relief, including an "Allowance Change Order for the escalation cost in the amount of $2,500,000."

42. On January 21, 2022, Sunrise responded to Current's letter and requested that Current provide specific information necessary to assess Current's position, including an explanation as to why Sunrise's liability for escalation was not capped at $250,000

per Section 4.3 of the Agreement. Sunrise advised that a meeting would be scheduled after the requested information was provided.

43. Instead of providing the information requested in Sunrise's January 21st letter, Current terminated the Agreement less than two weeks later.

44. Based on Sunrise's February 4, 2022 letter, Current understood that Sunrise disagreed with Current's position and disputed that Current had the right to terminate the Agreement. Nevertheless, Current refused to continue performance and responded to Sunrise on February 7, 2022, re-stating that Current had terminated the Agreement effective February 2, 2022.

45. [Defendant disputes that Plaintiff ever asked for bonds. Defendant does not address (and therefore does not dispute) the remaining portions of paragraph 45, reproduced here.]. Current also terminated the scheduled weekly Project meeting, and terminated Sunrise's access to the Project document management platform (Procore). Current took the position that it had "no further obligations under the [Agreement]" after February 2nd.

46. Sunrise responded to Current's February 7th letter on February 8th. Sunrise referenced Current's wrongful termination of the Agreement and provided Current seven days to cure its defaults. Current did not take any of the actions requested by Sunrise's February 8th letter. Current also issued correspondence on February 10th to Sunrise (with copy to the City of Coral Gables), stating that Current "is no longer the

Contractor associated with the above-referenced Project and will no longer participate in, or be responsible for, any further activities onsite or related to obtaining the Building Permit." Current also requested that its name be withdrawn from the pending building permit application.

47. Sunrise seeks Current's payment of the costs associated with reprocuring Current's remaining Agreement scope of work. Sunrise also seeks liquidated damages, prejudgment interest, and attorney's fees and costs, each as expressly permitted by the Agreement.

48. [Defendant disputes the overpayment amount. Defendant does not address (and therefore does not dispute) the remaining portions of paragraph 48, reproduced here.]. Sunrise's claims also include amounts associated with an overpayment to Current for Subcontractor Default Insurance ("SDI") and General Liability Insurance ("GLI"). In response to Payment Application No. 1, Sunrise paid Current $282,222 for SDI and $309,535 for GLI for the entire Project. Current, however, only incurred $16,953 in insurance costs prior to its February 2, 2022 termination of the Agreement.

49. After February 2nd, Current unilaterally applied this overpayment to reimburse Current for other costs allegedly incurred by Current and which had not been approved by Sunrise, including alleged General Conditions costs.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides, "summary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to judgment as a matter of law.'" *See Alabama v. N. Carolina*, 130 S. Ct. 2295, 2308 (2010) (quoting Fed. R. Civ. P. 56(a)). The existence of some factual disputes between litigants will not defeat an otherwise properly ground motion for summary judgment; "the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis added). Mere "metaphysical doubt as to the material facts" will not suffice. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251 (1986). The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party. *Allen v. Tyson Foods, Inc*., 121 F.3d 642, 646 (11th Cir. 1997). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc*., 975 F.2d 1518, 1534 (11th Cir. 1992).

If the moving party meets its legal obligation, then the burden shifts to the non-moving party to rebut that showing with admissible evidence to demonstrate a genuine issue of material fact. *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1314 (11th Cir. 2011). When deciding whether summary judgment is appropriate, the Court views all facts and resolves all doubts in favor of the nonmoving party. *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013).

However, "if the non-movant's response consists of nothing 'more than a repetition of his conclusional allegations,' summary judgment is not only proper, but required." *Bentley Motors Corp.*, 976 F. Supp. 2d 1297, 1309 (M.D. Fla. 2013) (citing *Morris v. Ross*, 663 F.2d 1032, 1034 (11th Cir. 1981)).

Even if the parties do not dispute the actual fact, disputes over the inferences that should be drawn from the fact can still preclude summary judgment. *Jeffrey v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995) (summary judgment is improper "if a reasonable fact finder evaluating evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact"); *Alabama Farm Bureau Mut. Cas. Co., Inc. v. Am. Fid. Life Ins. Co.*, 606 F.2d 602, 609 (5th Cir. 1979) ("Summary judgment may be improper, even though the basic facts are undisputed, if the ultimate facts in question are to be inferred from them, and the parties disagree regarding the permissible inferences that can be drawn from the basic facts.").

Ultimately, "[i]f reasonable minds could differ on the inferences arising from

undisputed facts, then a court should deny summary judgment." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992).

Cross motions for summary judgment do not change this standard. *Cooper v. Jefferson Cnty. Coroner & Med. Exam'r Off.*, 861 F. App'x 753, 755 (11th Cir. 2021). The Court must view "the evidence and all factual inferences therefrom in the light most favorable to the non-movant, and resolving all reasonable doubts about the facts in favor of the non-moving party." *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). Nonetheless, "on cross-motions for summary judgment . . ., courts should be very careful in their analysis to ensure that the proper party receives the benefit of the summary judgment standard." *FCOA LLC v. Foremost Title & Escrow Servs. LLC*, 57 F.4th 939, 959 (11th Cir. 2023).

## IV. **ANALYSIS**

### Plaintiff's Motion for Summary Judgment[3]

Plaintiff's motion requests that the Court find that: (i) Defendant improperly terminated and breached the parties' Agreement; (ii) Plaintiff properly terminated the Agreement due to Defendant's default; and (iii) Defendant's first and second Affirmative Defenses should be dismissed. [ECF No. 28-2, p. 20].

---

[3] The Undersigned will first address Plaintiff's Motion for Summary Judgment [ECF No. 28], followed by a discussion of Defendant's motion [ECF No. 29].

**A. Whether Defendant Improperly Terminated the Agreement**

Plaintiff argues that Defendant improperly terminated the Agreement because: (1) the potential right of termination under § 14.1.2 "did not exist"; (2) Plaintiff "did not suspend, delay or interrupt the entire Work" as described in § 14.3 of the General Conditions; (3) "the entire Work was not suspended, delayed, or interrupted for 120 days in a 365-day period"; and (4) Defendant was "required to continue performance pursuant to § 14.1.4." [ECF No. 28-2, p. 2].

Defendant's right to terminate the Agreement is in § 14.1.2. Section 14.1.2 of the Agreement states:

> The Contractor may terminate the Contract if, through no act or fault of the Contractor or a Subcontractor, Sub-subcontractor or their agents or employees or any other persons or entities performing portions of the Work under direct or indirect contract with the Contractor, repeated suspensions, delays or interruptions of the entire Work by the Owner as described in § 14.3[4] constitute in the aggregate more than 100 percent of the total number of days scheduled for completion, or 120 days in any 365-day period, whichever is less.

[ECF No. 33-3, p. 70 (footnote added)].

---

[4] Section 14.3 includes two subsections and is labeled "Suspension by the Owner for Convenience." *Id*. at 72. Section 14.3.1 states, "The Owner may, without cause, order the Contractor in writing to suspend or interrupt the Work in whole or in part for such period of time as the Owner may determine." *Id*. Section 14.3.2 relates to the contract sum and contract time being adjusted for increased costs and time caused by any "suspension or interruption as described in § 14.3.1." *Id*.

Plaintiff argues that the circumstance described in this section never arose under the undisputed facts, which means that § 14.1.4 obligated Defendant to continue performance. Section 14.1.4 states,

> Notwithstanding any provision here, Contractor **shall not stop performance** in the event there is a bona fide dispute with the Owner regarding any of the reasons set forth in § 14.1.1 or 14.1.2. The performance of the Work **shall proceed** without delay, but subject to Contractor's right to assert a claim in accordance herewith.

[ECF No. 33-3, p. 70 (emphasis supplied)].

Defendant argues that Work had commenced pursuant to the LNTP. [ECF No. 35, p. 4].

But Plaintiff contends that the Agreement repeatedly states that it is the NTP which triggers the commencement of Work -- and because the NTP was never issued, the Work never formally and actually commenced. [ECF No. 28-2, p. 9].

Plaintiff highlights §§ 3.1 from the Agreement and 8.1.2 from the General Conditions.[5] Section 3.1 is in Article 3, "Date of Commencement and Substantial Completion." [ECF No. 33-3, p. 2]. Section 3.1 states, "The date of commencement of the Work shall be noted in a formal [NTP] issued by the Owner." *Id*. Section 8.1.2 is in Article 8, "Time," and states, "The date of commencement of the Work is the date established in the Owner's [NTP]." *Id*. at 52. Plaintiff argues that the contract is clear in establishing that the NTP triggers the commencement of Work.

---

5 The parties' contract can be broken into two parts: the General Conditions and the Agreement.

However, Plaintiff fails to convince this Court as to *why* its LNTP does not qualify as a "formal [NTP]" when the LNTP **directly references** Article 3 of the Agreement and authorizes certain work to be completed. General Conditions Article 1 § 1.1.3 (entitled "The Work") states, "[t]he term 'Work' means the construction and services required by the Contract Documents, whether completed or **partially** completed, and includes **all** other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. **The Work may constitute** the whole or **part of the Project**." [ECF No. 33-3, p. 18 (emphasis added)]. The LNTP authorized Defendant to commence work regarding "dry utility work for Comcast, AT&T, and FPL Utility Undergrounding" and "Subcontractor & Vendor Awards with associated Shop Drawings & Submittals for the entire project". [ECF No. 33-3].

Plaintiff argues that a "termination pursuant to Section 14.1.2 requires, *inter alia*, the delay, suspension, or interruption of the "entire Work" for a period of 120 days." [ECF No. 28-2, p. 9]. However, the two approved projects within the LTNP arguably constituted the "entire Work" at that time because nothing else was authorized at the time. Neither the Agreement nor Plaintiff make any distinction between a NTP and an LNTP, nor do they explain how an LNTP is **not** a formal NTP. Therefore, without any contractual distinctions, the Court cannot for summary judgment purposes agree with Plaintiff and conclude that the LNTP did not function as a formal NTP. The LNTP was

a: (1) formal written document issued to Defendant; (2) issued **pursuant** to Article 3 (which, again, states that the formal NTP **triggers** the date of commencement); and (3) formal document which **authorized** Defendant to proceed with certain work.

Plaintiff acknowledges that Defendant performed *some* work before the NTP was issued. But it does not adequately answer the following question: If the work was not done pursuant to an NTP, then under what authority *was* the work provided (if not the LNTP?). In effect, Plaintiff is advancing the theory that *no* work was performed because the NTP had not issued at the time. But Plaintiff paid Defendant for the work it did before February 2, 2022, which is at odds with its argument. Is Plaintiff arguing that the work it paid for was actually not work at all because work had not officially commenced? Is Plaintiff suggesting that it incorrectly paid for work before it was authorized? It has not expressly raised those arguments, but it has not adequately explained its seemingly inconsistent position. The Undersigned therefore rejects Plaintiff's argument that the LNTP did not function as a formal NTP.

Defendant states that the LNTP subsequently ordered a suspension or interruption because it includes the following language: "[n]o additional **<u>physical</u>** work (other than what you have performed to date) is to occur on site **<u>until you are provided written authorization to proceed with the remainder of the job</u>**." [ECF No 35, p. 5 (emphasis supplied)]. Plaintiff argues that the LNTP did not order the *suspension* of any work, but actually *authorized* certain work to proceed (while prohibiting only certain

other work). [ECF No. 55, p. 7]. The Court agrees. The LNTP explicitly excludes "physical work . . . on site," and the definition of work **includes** the "construction **and services** required by the Contract[.]" [ECF No. 33-3 (emphasis added)]. Therefore, any off-site, non-physical work, such as services including the preparation of Shop Drawings, was still authorized, and Defendant's argument that Plaintiff suspended or delayed all Work fails.

Defendant contends that it completed the work authorized under the LNTP on October 2, 2021. [ECF No. 35, p. 7]. Plaintiff argues that Defendant had not finished the assignments within the LNTP because it "continued with subcontractor and vendor awards through February 2, 2022, and had not awarded all of its subcontracts as of February 2, 2022." [ECF No. 28-1, ¶ 22]. Plaintiff further states that Defendant requested authorization to enter into agreements with subcontractors in December 2021 and January 2022. *Id*. Defendant argues that the various activities Plaintiff listed, such as subcontractor and vendor awards, do not qualify as "Work" under the contract, and that all "Work" under the contract was completed by October 2, 2021. [ECF No. 35, p. 6]. Defendant defined "Work" using the language from Article 2 § 2.1 in the contract.

The Undersigned previously rejected Defendant's argument in my Order on Plaintiff's Motion *in Limine* [ECF No. 58]. "Defendant's argument that 'Work' is defined' in § 2.1 is incorrect because § 2.1 *describes* what the "Work of the Contract **generally consists of**" but does not *define* it." *Id*. at 14. Therefore, because the activities that

Defendant concedes[6] to have engaged in (i.e., issuing the subcontractor and vendor awards) qualify as "Work" under the contract, Defendant was *still* performing work under the contract **after** October 2, 2021.

Without considering Defendant's affirmative defenses (that Plaintiff committed the first material breach by failing to timely obtain the Building Permit), the Undersigned finds that Defendant did not have the right to terminate under the contract because Plaintiff never ordered Defendant "to suspend or interrupt the Work in whole or in part" and because Defendant continued to "Work" through February 2, 2022 without any "repeated suspensions, delays, or interruptions for 120 days in a 365-day period." [ECF No. 28-2, p. 9].

Plaintiff contends that Defendant *never* notified it "of any alleged suspension or interruption of the Work before its February 2, 2022 notice of termination." [ECF No. 28-2, p. 11]. Interestingly, it is undisputed that less than a month before Defendant's notice of termination, Defendant requested an Allowance Change Order in the amount of $2,500,000 due to increasing costs. *Id*. Section 4.3 of the contract states that "for the period between the LNTP and the main project NTP, the Owner and Contractor will split, 50% to Owner and 50% to Contractor, cost escalation up to $500,000 **with a**

---

6 The Undersigned uses the term "concedes" here because, in its response to Plaintiff's statement of material facts, Defendant does not deny or dispute whether it was completing assignments after October 2, 2021 -- only whether those assignments qualified as "Work" under § 2.1 of the contract (which is an incorrect view because § 1.1.3 is what defines "Work"). [ECF No. 35-1].

**maximum expenditure for the Owner not to exceed $250,000** which will be processed as a contract change order." [ECF No. 33-3, p. 4 (emphasis added)]. So Defendant's request was $2.25 million more than the contract authorized for a change order.

In response to this request, Plaintiff asked Defendant to provide supporting information, including reasons justifying the request, given the express language of § 4.3. [ECF No. 28-2, p. 11]. Defendant does not dispute that, instead of providing any supplemental information or reasoning to Plaintiff, it terminated the contract. Until it received Defendant's purported notice of termination, Plaintiff was unaware of Defendant's contention "that the entire Work had been suspended since October 2, 2021." *Id*.

Plaintiff's final argument within this section is whether Defendant was "required to continue performance pursuant to § 14.1.4." *Id*. at 2. Section 14.1.4 states, "Notwithstanding any provision here, **Contractor shall not stop performance in the event there is a bona fide dispute with the Owner** regarding any of the reasons set forth in § [sic] 14.1.1[7] or 14.1.2[8]. The performance of the Work shall proceed without

---

[7] Section 14.1.1 states:

> The Contractor may terminate the Contract upon seven (7) days' written notice to the Owner if the Work has been stopped for a period of ninety (90) consecutive days through no act or fault of the Contractor or a Subcontractor, Sub-subcontractor or their agents or employees or any other persons or entities performing portions of the Work under direct or indirect contract with the Contractor, for any of the following reasons:

delay, but subject to Contractor's right to assert a claim in accordance herewith." [ECF No. 33-3, p. 70 (emphasis added)].

As previously stated, without considering Defendant's affirmative defenses that Plaintiff breached first, Defendant did not have the right to terminate the contract because none of the applicable circumstances arose under §§ 14.1.1 or 14.1.2.[9] A plain reading of § 14.1.4 mandates that Defendant was obligated to continue performing its obligations until the parties could come to a resolution under § 4.4.1. Section 4.4.1

---

1. Issuance of an order of a court or other public authority having jurisdiction which requires all Work to be stopped; or

2. An act of government, such as a declaration of national emergency which requires all Work to be stopped; or

3. If the Work was stopped in accordance with Section 9.7.1.

[8] Section 14.1.2 of the Agreement states:

> The Contractor may terminate the Contract if, through no act or fault of the Contractor or a Subcontractor, Sub-subcontractor or their agents or employees or any other persons or entities performing portions of the Work under direct or indirect contract with the Contractor, repeated suspensions, delays or interruptions of the entire Work by the Owner as described in § 14.3[8] constitute in the aggregate more than 100 percent of the total number of days scheduled for completion, or 120 days in any 365-day period, whichever is less.

[9] Defendant's Notice of Termination was pursuant to § 14.1.2. {ECF No. 28-2, p. 13].

mandates that the parties meet within thirty (30) days of either party making a claim to attempt to resolve the dispute prior to proceeding with litigation.[10]

Defendant argues that it could not continue to perform because "there was no Work that [Defendant] could proceed to perform." [ECF No. 35, p. 8]. The Court is not convinced. Aside from Defendant's misunderstanding of what "Work" means, Defendant was undisputedly still performing. For example, in an email written by Defendant's Vice President of Construction, Goran Ljustina, on January 6, 2022 summarizing what was discussed in reference the Change Order request, Ljustina wrote that "[Defendant] will reach out to another contractor who built a project in the vicinity (that does not appear to have the drainage well), and find out what they did re. storm water collection." [ECF No. 33-28, p. 3].

Without considering Defendant's affirmative defense of prior breach by Plaintiff, the Undersigned agrees with Plaintiff that Defendant impermissibly terminated the contract. However, due to the interplay of claims, the potential disputed issues of material fact between both motions and Defendant's prior breach affirmative defenses, the Court will complete its full analysis before conclusively ruling in either party's favor on their respective summary judgment motions.

---

[10] Under § 4.3.2 "Claims by either party must be initiated within 21 days after occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes, or should have recognized upon the exercise of due diligence, the condition giving rise to the Claim, whichever is later. . ." [ECF No. 33-3, p. 41].

Defendant's Answer included thirty-two affirmative defenses. [ECF No. 21]. Defendant refers to four of those defenses in its response to Plaintiff's summary judgment motion. [ECF No. 35, p. 2]. Defendant contends that Plaintiff's arguments fail to overcome its first, second, fifth, and sixth affirmative defenses. The affirmative defenses are as follows:

> Current [ ] states as it [sic] first affirmative defense that Plaintiff failed to satisfy the conditions precedent to bring this lawsuit. More specifically, Plaintiff failed to comply with Sections 4.3.2 and 4.4.1 of the General Conditions . . . which set forth the mandatory dispute resolution procedures. Plaintiff never provided the required written notice of claim to the Architect or Current [ ] within twenty-one (21) days or at any time, and therefore the procedures for providing written documentation and explanation of the claim to both Current [ ] and the Architect was not done, nor did Plaintiff conduct the required meeting with Current [ ].
>
> ***
>
> Current [ ] states as its second affirmative defense that Plaintiff waived its right to bring this lawsuit pursuant to Section 4.3.2 of the Agreement based upon its failure to comply with the Agreement's mandatory dispute resolution procedures.
>
> ***
>
> Current [ ] states as its fifth affirmative defense that Plaintiff's Breach of Contract claims are barred based upon its prior breach in failing to issue the Notice to Proceed to Current [ ] in December 2021, or at any time thereafter.
>
> ***
>
> Current [ ] states as its sixth affirmative defense that Plaintiff's Breach of Contract claims are barred based upon its prior breach in failing to obtain the Building Permit.

[ECF No. 21, pp. 16-17].

Defendant's fifth and sixth affirmative defenses have to do with Plaintiff's alleged prior breach, and Defendant's first two affirmative defenses are focused on

Plaintiff's alleged failure "to satisfy the conditions precedent to bring this lawsuit" and how that failure "waived its right to bring this lawsuit." *Id*. Section 4.3.2 requires that written notice of the claim or dispute "is a condition precedent to obtaining any relief pursuant to such claim [;]" and that the failure to provide that "shall constitute a waiver of the claim." [ECF No. 33-3, p. 41]. Plaintiff argues that these affirmative defenses ignore the fact that Defendant failed to submit a claim itself under § 14.1.2, and that as a result its "reliance on Sections 4.3.2 and 4.4.1" are barred. [ECF No. 34, p. 10].

The Court agrees that these affirmative defenses are problematic for several reasons: (1) Defendant argues that Plaintiff's claims are barred due to their prior breach yet Defendant never mentioned either "breach" to Plaintiff before its termination of the Agreement; (2) Defendant states that Plaintiff "breached" twice yet never began the dispute resolution process under § 4.3.2; (3) In its sworn interrogatory responses to Plaintiff, Defendant stated that there were no breaches attributable to Plaintiff. After Current filed its Answer and Affirmative Defenses alleging Plaintiff's breach, Plaintiff requested the Undersigned exclude Defendant's "Plaintiff breached first" argument because it failed to update its interrogatory responses. [ECF No. 43-1, p. 12]. Defendant conceded that it did not include any language related to Plaintiff's breach until *after* its

Motion to Dismiss was denied, forcing Defendant to file its Answer (and affirmative defenses). [ECF No. 49, p. 8].[11]

This web of factual fuzziness is for the **jury** to decipher. While Defendant's affirmative defenses may appear to some to be illogical and nothing more than after-the-fact, make-weight arguments, the Undersigned is barred from making credibility assessments in a summary judgment context. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (quoting *Anderson*, 477 U.S. at 255).

**B. Whether Plaintiff Properly Terminated Defendant for Cause**

Plaintiff argues that Defendant's "refusal to perform constituted both a repudiation and a material breach" of the Contract. [ECF No. 28-2, p. 14]. Plaintiff states that § 14.2.1 permitted it to terminate the contract upon seven (7) days written notice where [Defendant] "'persistently or repeatedly refuses or fails . . . to supply enough properly skilled workmen or proper materials, . . . or if [Defendant] repeatedly fails to meet the Contract Schedule, or if [Defendant] otherwise is guilty of a substantial violation of a provision of the Contract Documents [.]'"*Id*. Defendant concedes that

---

11 In the Undersigned's Order on Plaintiff's Motion *in Limine*, the Undersigned rejected Plaintiff's argument after considering the relevant caselaw and prejudice suffered. [ECF No. 58].

Plaintiff issued a "Seven Day Cure Notice" on February 8, 2022 and that it did not take any action in response to cure it. [ECF No. 35-1, p. 4].

Defendant contends that Plaintiff's argument fails because Plaintiff never provided the written notice of its claim prescribed by the contract. [ECF No. 35, p. 9]. Defendant argues that *Plaintiff* had to initiate the claim, **not** Defendant, because Plaintiff's breach left the Defendant with no work to perform. *Id*. at 10. According to Defendant, Plaintiff allegedly breached because it failed to timely obtain the building permit and failed to issue a second NTP. *Id*. However, as previously discussed, Defendant still had work to perform (and was still working) when it terminated the contract. Plaintiff's alleged failure to obtain a building permit or issue a second NTP **did not stop** Defendant from working on its other tasks, such as those related to off-site services. Additionally, under § 14.1.4, the contract **obligated** Defendant to **continue** working on the project in the event of a dispute.

Defendant also states that Plaintiff's termination was baseless because Defendant's February 2, 2022 Notice of Termination was proper, yet it fails to provide argument or reasoning as to why. [ECF No. 35, p. 9]. Defendant's response is void of any reasoning or explanation as to why it neither made a claim nor initiated a claim meeting under § 4.4.1. Therefore, the Undersigned is unable to agree with Defendant and, without considering Defendant's defense that Plaintiff breached first, finds that

Defendant's Notice of Termination was improper because of its failure to follow the contract's mandatory dispute resolution process.

Plaintiff argues that *it* was not required to comply with the contract's claim resolution procedures because Defendant repudiated the contract. [ECF No. 36, p. 5]. Florida courts have explained repudiation as:

> A prospective breach of contract occurs when there is absolute repudiation by one of the parties prior to the time when his performance is due under the terms of the contract. Such a repudiation may be evidenced by words or voluntary acts but the refusal must be distinct, unequivocal, and absolute.

*Mori v. Matsushita Elec. Corp. of Am.*, 380 So. 2d 461, 463 (Fla. 3d DCA 1980).

> The law is clear that where one party to the contract arbitrarily demands performance not required by the contract and couples this demand with a refusal to further perform unless the demand is met, the party has anticipatorily repudiated the contract, **which anticipatory repudiation relieves the non-breaching party of its duty to further perform and creates in it an immediate cause of action for breach of contract**.

*24 Hr Air Serv., Inc. v. Hosanna Cmty. Baptist Church, Inc.*, 322 So. 3d 709, 712 (Fla. 3d 2021) (emphasis added) (quoting *Twenty-Four Collection, Inc. v. M. Weinbaum Constr., Inc.*, 427 So. 2d 1110, 1111 (Fla. 3d DCA 1983)). If Defendant anticipatorily repudiated the contract by its termination, then Plaintiff would no longer be obligated to follow the claim resolution process. This same result occurs if Plaintiff's failure to obtain the second NTP or building permit are considered anticipatory repudiation.

The Undersigned is unconvinced that Plaintiff's actions constitute repudiation. Plaintiff never *refused* to perform its responsibilities under the contract (i.e., obtaining

the second Notice or building permit). Plaintiff was merely *delayed*. A delay is not "distinct, unequivocal, and absolute," especially when Plaintiff eventually obtained both items for the project. Additionally, as previously stated, Plaintiff never suspended or delayed all work from proceeding.

However, as explained in the following section, whether Plaintiff breached first is a factual dispute **barring** the Undersigned from making a final finding in either party's favor. "[E]ven though the basic facts are undisputed, if the ultimate facts in question are to be inferred from them, and the parties disagree regarding the permissible inferences that can be drawn from the basic facts[ ]" then summary judgment is improper. *Alabama Farm Bureau Mut. Cas. Co., Inc.*, 606 F.2d at 609.

### C. Whether Defendant's First or Second Affirmative Defenses Should Be Dismissed

Plaintiff argues that Defendant's first two affirmative defenses should be dismissed because Plaintiff's Complaint was not barred by its "failure" to follow the claim resolution process. [ECF No. 28-2, p. 16]. If Defendant unilaterally terminated the contract (i.e., repudiated the contract) and abandoned the Project and Plaintiff did not **first** breach by failing to timely obtain the Building Permit or second NTP, then Defendant cannot successfully argue that Plaintiff failed to follow the claim procedures.

Defendant's "Plaintiff-breached-first" argument must clear several significant hurdles, including the undisputed fact that Defendant never at the time contended that Plaintiff breached the contract first by not obtaining the permit and not issuing the NTP

by December 2021. Defendant did not raise the "first breach" theory until later, **after** Plaintiff asked for more information about its request for a $2.5 million change order. Although a request for a $2.5 million change order is inconsistent with a position that Plaintiff breached first (before the request was made), the Undersigned feels uncomfortable reaching that decision in a summary judgment motion posture and considers it more prudent to allow a jury to decide that important issue. If I were sitting here as the factfinder in a bench trial where I had full consent jurisdiction, then I very well might choose Plaintiff's position and reject Defendant's first breach argument as being factually unpersuasive.

But the Undersigned is **not** in the procedural posture in which that conclusion could be safely reached.

Thus, the issue of which party breached first is a factual dispute, which means the issue of whether Plaintiff needed to follow the claims procedure is *also* a disputed issue of material fact. Therefore, a jury must decide it and the Undersigned will not be issuing a recommendation that Plaintiff's summary judgement motion be granted. Instead, this Report and Recommendation will recommend that the Court **deny** Plaintiff's summary judgment motion because of the material factual disputes.

<u>Defendant's Motion for Summary Judgment</u>

Defendant's motion requests that the Court rule in its favor on all counts because Plaintiff's "claims are contractually barred because it did not follow the Contract's

mandatory dispute resolution procedures prior to filing its lawsuit against" Defendant. [ECF No. 29, p. 2]. Defendant additionally argues that Plaintiff's breach of contract claims should be ruled in Defendant's favor because Plaintiff previously breached and "does not have any contractual damages based upon the fact that [Defendant] terminated the Contract and because [Plaintiff] contractually waived all consequential damages." *Id*. Finally, Defendant requests this Court to rule in its favor on Counts III (Unjust Enrichment) and IV (Quantum Merit) "because there is no dispute that the parties entered into a written contract." *Id*.

The Undersigned recommends that Defendant's first two requests be **denied** for the same reasons included in the recommendation that Plaintiff's motion be denied -- they hinge on whether Plaintiff breached first, and that is exclusively a disputed factual issue for the jury to decide.

**D. Counts III and IV**

Defendant argues that the Court should grant summary judgment against the Plaintiff on these two counts "because there is no dispute that the parties entered into a written contract." *Id*. Count III is related to Unjust Enrichment and Count IV is related to Quantum Merit. Both were filed "in the alternative". [ECF No. 20, pp. 23-24].

Defendant states that "an unjust enrichment claim can only be pled in the alternative if one or more parties contest the existence of an express contract governing the subject of the dispute[,] and this is not the case here." *Zarrella v. Pac. Life Ins. Co.*, 755

F. Supp. 2d 1218, 1227 (S.D. Fla. 2010) (quoting *In re Managed Care Litig*., 185 F. Supp. 2d 1310, 1337–38 (S.D. Fla. 2002)). Like in *Zarella*, the parties here do not dispute the existence of an express contract governing their dispute. The *Zarella* Court provided the following summary as to unjust enrichment claims:

> No cause of action in unjust enrichment can exist where the parties' relationship is governed by an express contract. *Webster v. Royal Caribbean Cruises, Ltd*., 124 F. Supp. 2d 1317, 1326–27 (S.D. Fla. 2000*); see also Berry v. Budget Rent A Car Sys., Inc*., 497 F.Supp.2d 1361, 1369 (S.D. Fla. 2007) ("a quasi-contractual claim fails upon a showing that an express contract exists"). This is because "the theory of unjust enrichment is equitable in nature and is, therefore, not available where there is an adequate legal remedy." *Webster*, 124 F. Supp. 2d at 1326 (citing *Gary v. D. Agustini & Asociados, S.A*., 865 F. Supp. 818, 827 (S.D. Fla. 1994)).

*Id*. (*See also Webster*, 124 F. Supp. 2d at 1326 (noting that under Florida law, "quantum meruit damages cannot be awarded when an enforceable contract exists")).

Plaintiff argues that Count III and IV are based on Defendant's "failure to return amounts **after** the termination of the agreement." [ECF No. 39, p. 18 (emphasis added)]. However, neither party denies the existence of an express contract. Plaintiff cited multiple cases but *none* are applicable because, unlike here, the defendants there denied the existence of an express contract.

"[U]pon a showing that an express contract **exists**, the quasi-contract claim fails." *ThunderWave, Inc. v. Carnival Corp*., 954 F. Supp. 1562, 1566 (S.D. Fla. 1997) (citing *Garcia v. Cosicher*, 504 So. 2d 462, 463 n. 2 (Fla. 3d DCA), *rev. denied*, 513 So. 2d 1060 (Fla. 1987) (no quantum meruit recovery justified in view of the express contract); *Bowleg v. Bowe*,

502 So. 2d 71, 72 (Fla. 3d DCA 1987) (unjust enrichment claim fails where a valid final contract exists); *Solutec Corp. v. Young & Lawrence Assocs., Inc.*, 243 So. 2d 605, 606 (Fla. 4th DCA 1971) (conclusive proof of a valid express contract precludes suit for quantum meruit, since "the law will not imply a contract where a **valid express contract** exists") (emphasis added)).

Plaintiff failed to provide any argument or supporting authority allowing it to move forward on these Counts when neither party denies the contract's existence. Therefore, the Undersigned must recommend that the Court **grant** Defendant's summary judgment motion as to Plaintiff's Counts III and IV. Plaintiff may pursue the amounts currently alleged in the quantum meruit and unjust enrichment counts as part of its breach of contract claim.

## V. CONCLUSION

The Undersigned recommends that the Court **deny** Plaintiff's summary judgment motion in its totality and **partially deny** Defendant's motion due to the shared presence of genuine issues of material fact. Plaintiff's requests rest on whether it breached first, an issue for the jury; and Defendant's first two requests rely on the same principle. Only Defendant's third request, that the Court grant summary judgment in its favor on Plaintiff's Counts III and IV, involve undisputed facts. Because neither party denies the existence of the express contract or provides any authority stating otherwise, the Undersigned recommends that Defendant's motion be **granted** on Counts III and IV.

## VI. OBJECTIONS

The parties will have ten (10) days from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with Senior United States District Judge Federico A. Moreno. Each party may file a response to the other party's objection within ten (10) days of the objection.[12] Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED**, in Chambers, in Miami, Florida, on October 17, 2023.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

[12] The Undersigned is shortening the deadlines for Objections and Responses because the issues have been amply briefed and because of the upcoming trial date. The Undersigned recognizes that the parties filed [ECF No. 60] a joint motion to continue the trial date, but there is no guarantee that Judge Moreno will grant it. Therefore, the Undersigned is using the existing trial date of December 4, 2023 [ECF No. 59, establishing updated dates for the trial calendar, the pretrial conference, and the calendar call.].

**Copies furnished to:**
The Honorable Federico A. Moreno
All Counsel of Record